**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JON EVAN CEARLOCK,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**AUTUMN DANIELLE SUTTON,**<br>**ALLISON STOUT MOORE,**<br>**ALLEN LAWLESS,**<br>**KEITH MEIER,**<br>**BRANDI BELTS,**<br>**TYLER MOORE,**<br>**BROCK FISCHER,**<br>**NANNY,**<br>**JUSTIN OWENS,**<br>**SGT. MERRIMAN,**<br>**LU WALKER,**<br>**JOHN DOE,**<br><br>**Defendants.** | **Case No. 3:25-cv-01951-GCS** |

**MEMORANDUM & ORDER**

**SISON, Magistrate Judge:**

Plaintiff Jon Evan Cearlock, an inmate in the custody of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Centralia Correctional Center, brings this civil action pursuant to 42 U.S.C. §1983 for violations of his constitutional rights that occurred while he was incarcerated at Shawnee Correctional Center ("Shawnee"). Plaintiff alleges that in 2024 Autumn Danielle Sutton, a staff member at Shawnee, coerced him into having a sexual relationship with her, while fellow staff members either encouraged and assisted in facilitating the sexual encounters or failed to

intervene to prevent the ongoing sexual abuse.

This case is now before the Court for preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A.[1] Under Section 1915A, any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or requests money damages from a defendant who by law is immune from such relief must be dismissed. *See* 28 U.S.C. §1915A(b).

**THE COMPLAINT**

Plaintiff alleges that in 2023, while he was incarcerated at Shawnee, Autumn Danielle Sutton, a staff member, asked Plaintiff to help her organize sports tournaments for the facility. (Doc. 1, p. 7). Plaintiff describes Sutton as "nice" and always talkative during their early interactions. *Id.* Sutton would ask Plaintiff questions about his life outside of prison and often told him that he did not "belong in prison." *Id.*

In January 2024, Sutton confessed to Plaintiff that she "liked him on a romantic level." (Doc. 1, p. 7). Plaintiff told Sutton that he was not interested in a romantic relationship with her because "things like that don't play out well for the inmate." *Id.* Sutton ignored Plaintiff's refusal to have a romantic relationship and began pursuing Plaintiff. *Id.*

On one occasion, Sutton asked Plaintiff to put away yoga mats, and while Plaintiff was pushing a cart into the shower area, Sutton caught Plaintiff by surprise and pushed

---

[1] The Court has jurisdiction to screen the Complaint due to Plaintiff's consent to the full jurisdiction of a magistrate judge (Doc. 6), and the limited consent to the exercise of magistrate judge jurisdiction as set forth in the Memorandum of Understanding between the Illinois Department of Corrections and this Court.

him against the wall. (Doc. 1, p. 7). She kissed Plaintiff, shoved her hand down his pants, licked and stroked his penis, and then left the room. *Id.* Following the encounter, Plaintiff was stressed and fearful of getting into trouble. *Id.* Plaintiff expressed his fears to Sutton. *Id.* He told her that he had been incarcerated for twenty years and had never had a disciplinary issue. *Id.* Sutton responded that they had "nothing to worry about" because Internal Affairs Officer Allison Stout Moore was her friend. *Id.* Sutton also stated, "[y]ou're going to give me what I want." *Id.*

During this time, Plaintiff worked in the industries department, and Plaintiff's bosses, Allen Lawless, Keith Meier, Justin Owens, and Nanny, were aware that Sutton had romantic feelings for Plaintiff. (Doc. 1, p. 7). Rather than intervene to prevent the sexual abuse, however, these individuals allowed and encouraged Sutton's sexual advances towards him. *Id.* at p. 11-12. Plaintiff states that they thought the relationship was funny because it made him nervous and uncomfortable. *Id.* at p. 7.

Plaintiff describes how in January 2024, Sutton told Meier that she wanted Plaintiff to make her a birthday gift, and so, Meier instructed Plaintiff to make something for Sutton and take it to her. (Doc. 1, p. 7). Repeatedly, Lawless, Meier, Owens, and Nanny would bring in food for Plaintiff to cook for breakfast, and they would invite Sutton over to eat with them. *Id.* Sutton would kiss Plaintiff while he was cooking breakfast, and after she would leave, Lawless, Meier, Owens, and Nanny would tease and laugh at Plaintiff. *Id.* at p. 7, 11-12. Plaintiff also alleges that Owens and Nanny would take Plaintiff to see Sutton whenever she requested. *Id.*

Sutton began increasing her contact with Plaintiff and started visiting him at work

in the industries department several times a day. (Doc. 1, p. 7). Plaintiff asserts that it "was as if [Sutton had] made [him] her boyfriend and [he] didn't have a choice." *Id.* at p. 8. She would bring Plaintiff notes and would get angry if Plaintiff did not respond or become jealous if Plaintiff spoke to other female employees. *Id.* at p. 7-8. Sutton had Correctional Officer Brandi Belts print out Plaintiff's visitor and phone call information so that Sutton could monitor if he was communicating with other women. *Id.* at p. 8. Belts even assisted Sutton in setting up a messaging account where Sutton could message Plaintiff under the name "Danielle Smith," for anonymity. *Id.* Plaintiff claims that Belts had set up a similar messaging account for herself so that she could message inmates, including Plaintiff. *Id.* Plaintiff told Sutton to ask Belts to stop messaging him. *Id.* Eventually, Internal Affairs discovered that Belts was messaging inmates, and her messaging account was blocked. *Id.* According to Plaintiff, Belts was forced to quit her job at Shawnee "over her own PREA incident." *Id.* Even after Belts's secret messaging account was discovered, Plaintiff was never questioned by Internal Affairs, and Sutton assured Plaintiff that Internal Affairs "had [them] cover[ed]." *Id.*

As the weeks passed, Sutton became more aggressive in her pursuit of Plaintiff and coerced Plaintiff into having sex with her, despite Plaintiff reiterating that he was scarred and did not want to get into trouble. (Doc. 1, p. 8, 11). The first few times Sutton demanded that he have intercourse with her, they were inside the equipment shack. *Id.* at p. 8. Plaintiff states he was unable to obtain an erection because he was "so scared of getting into trouble," and he was "doing things [he] did not really want to do." *Id.* Sutton became upset and asked Plaintiff whether he found her attractive. *Id.* Plaintiff told her

that he was "very nervous and wanted a condom before" having sex. *Id.* Sutton and Plaintiff continued to meet in the equipment shack. *Id.* After a few meetings, Plaintiff was able to maintain an erection, and Sutton and Plaintiff had "sexual encounters" at various locations at Shawnee, including the equipment shack, gym shower, maintenance area, dog room closet, and industries back-office area. *Id.*

To spend more time with Plaintiff, Sutton took a position with the "dog program" at Shawnee and became Plaintiff's boss. (Doc. 1, p. 8). Plaintiff became less nervous about being disciplined for their relationship because Sutton's continued promises to protect him appeared to be true. *Id.* Plaintiff states that at this point their sexual relationship had been "going on for a while," various staff members knew about the relationship, and yet, disciplinary action had not been taken. *Id.* Sutton introduced herself to Plaintiff's parents when they came to visit Plaintiff at Shawnee, and she began regularly talking and texting with his mother. *Id.* at p. 8, 11.

At some point, Sutton came to Plaintiff crying because Correctional Officer Tyler Moore had made disparaging remarks about Sutton being in a sexual relationship with Plaintiff in a Facebook group chat. (Doc. 1, p. 8). Plaintiff "begged [Sutton] to just leave [him] alone," but she refused. *Id.* Sutton told Plaintiff she loved him and wanted to "spend forever with [him]." *Id.* A few times, Plaintiff tried to end the relationship. *Id.* His attempts were unsuccessful, and Sutton would cry and threaten to "tell everything" if he did. *Id*.

Around August 2024, Correctional Officer Tyler Moore was assigned as the officer in the industries department where Plaintiff worked. (Doc. 1, p. 8). When Sutton came to

visit Plaintiff as usual, Moore "cussed her out for coming to see [Plaintiff] and told her she had no business there." *Id.* at p. 9. Moore informed Sutton that if she returned to visit Plaintiff, he would "report her." *Id.* Moore further told Plaintiff he would have Plaintiff transferred to Menard Correctional Center, if Plaintiff did not stop the relationship. *Id.* Rather than ending the relationship, however, Sutton began visiting Plaintiff during the second shift when Moore was not working. *Id.* Finally, Meier forbade Sutton from visiting Plaintiff at work because "too many people were talking." *Id.* Again, rather than ending the relationship, Sutton adjusted her schedule and visited Plaintiff at work when only either Owens or Nanny were present. *Id*.

Sutton was eventually confronted about her sexual relationship with Plaintiff by an employee named Steve Jones. (Doc. 1, p. 9). Sutton admitted to the relationship and shared with Jones that she and her husband were separated. *Id.* Sutton shared with Jones her plan to quit her job at Shawnee and have Plaintiff transferred to a new facility and then paroled "to her place" so that they could "be together." *Id.*

In September 2024, while Plaintiff and Sutton were in a classroom in the school building "hanging out," Sutton received a phone call. (Doc. 1, p. 9). After taking the call, Sutton informed Plaintiff he needed to go back and pack his belongings because he was being placed in segregation. *Id.* Sutton advised Plaintiff to "keep [his] mouth shut and everything would be fine." *Id.*

Plaintiff was placed in "receiving" on September 11, 2024. (Doc. 1, p. 9). In receiving, Plaintiff did not have access to any programing, including the gym, the yard, and religious services. *Id.* No one would tell Plaintiff why he was being held there. *Id.* He

was later taken to speak to Assistant Warden Lu Walker in her office. *Id.* Walker instructed Plaintiff to "initiate a transfer." *Id.* Plaintiff responded that he did not want to transfer to a different facility because he made around $900/month working in the industries department, and he was also a peer educator for the dog program. *Id.* Walker stated she did not want him to get into trouble and he would be "stuck in receiving until [he] transferred." *Id.* When Plaintiff asked what he did wrong, Walker informed him that she was not allowed to discuss it. *Id.* Plaintiff was then sent back to his cell. *Id.*

A few days after meeting with Walker, Counselor James Hall came to Plaintiff's cell and asked if he wanted to initiate a transfer. (Doc. 1, p. 9). Plaintiff describes this question as unusual because typically a transfer occurs without input from the inmate. *Id.* at p. 9-10. Plaintiff refused to initiate a transfer, and Hall stated he would notify the warden. *Id.* at p. 10.

On November 22, 2024, Plaintiff was taken to the adjustment committee room to speak with Sutton. (Doc. 1, p. 10). Even though Plaintiff was under investigation for a PREA violation, this meeting was allowed by the wing officer, the control officer, and the escorting officer. *Id.* Sutton again told Plaintiff to keep his mouth shut because Allison Stout Moore of Internal Affairs had them "covered." *Id.*

A week later, Plaintiff was "shaken down" by the tactical team on three different occasions, and he was also shaken down by Allision Stout Moore. (Doc. 1, p. 10). The tactical team confiscated from Plaintiff letters he wrote to Director Hughes and Southern Director Kim Smith, copies of his PREA grievance filed with the ARB, his mattress, and items purchased from the commissary. *Id.* Stout Moore took Plaintiff's address book in

which he recorded his sexual encounters with Sutton, letters and text messages from Sutton, and sexually explicit pictures of Sutton. *Id.* Plaintiff states he was never issued a shake down slip. *Id.*

Plaintiff was interviewed by Internal Affairs Officer Lieutenant Banks and State Investigator Stanhouse. (Doc. 1, p. 10). Plaintiff asserts he was afraid to say anything because Banks was Stout Moore's boss, and Stout Moore had recently shaken him down and was friends with Sutton. *Id*. Banks and Stanhouse assured Plaintiff he "was a victim in a PREA case" and he had done nothing wrong *Id*. Following the interview, Plaintiff was transferred to Centralia Correctional Center ("Centralia"). *Id*.

Because of Sutton's sexual abuse and misuse of her authority, Plaintiff asserts that he lost his jobs at Shawnee and was forced to transfer to a facility far from his elderly parents. (Doc. 1, p. 10). Following his transfer, Plaintiff was not provided counseling or any type of mental health assistance. *Id.* He was extremely depressed, and he worried that he would suffer mistreatment by staff at Centralia because Sutton was well liked at Shawnee and has friends on the statewide tactical team. *Id.* Plaintiff states he attempted to stay on good terms with Sutton after his transfer so she would "keep [staff] off [his] back." *Id.* Plaintiff alleges he still is still concerned that staff may "give him problems" because of his relationship with Sutton. *Id.* Plaintiff has fourteen years left on his sentence, and he asserts he "will never be able to escape the rumors that have followed [him.]" *Id.*

## Preliminary Dismissals

In the Complaint, Plaintiff described an incident where he was sexually assaulted by a staff member named Jay Meadly on an unspecified date. (Doc. 1, p. 9). Meadly,

however, is not listed as a defendant in the case caption, and the allegations do not appear to be connected to the claims against any of the named defendants. Because the Court cannot treat individuals not listed in the caption as defendants, any intended claims against Meadly are dismissed without prejudice. *See, e.g.*, *Myles v. United States*, 416 F.3d 551, 551–552 (7th Cir. 2005) (noting that to be properly considered a party a defendant must be "specif[ied] in the caption").

The Court also dismisses all claims against John Does, described as members of the tactical team. Plaintiff asserts the John Does shook his cell down to retaliate and intimidate him. (Doc. 1, p. 13). His allegations against the John Does are too vague to state a claim. While Plaintiff may use "John Doe" or "Jane Doe" to refer to parties whose names are unknown, he must still follow Federal Rule of Civil Procedure 8 pleading standards and include a short, plain statement of the case against individuals. Merely asserting that a group of officers violated his constitutional rights is insufficient. *See, e.g.*, *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (finding the phrase "one or more of the Defendants" did not adequately connect specific defendants to illegal acts and thus failed to adequately plead personal involvement). Furthermore, the belief that each individual John Doe was motivated by Plaintiff's First Amendment activity because they confiscated documents from his cell, which included a copy of his PREA complaint and correspondences with IDOC officials, is speculation that does not support a reasonable inference of retaliation. *See Ripberger v. Corizon, Inc.*, 773 F.3d 871, 883 (7th Cir. 2014). Accordingly, Plaintiff has failed to state a constitutional claim against the John Does, and they shall be dismissed as defendants.

## DISCUSSION

Based on the allegations in the Complaint, the Court finds it convenient to delineate the following counts:

**Count 1:** Eighth Amendment cruel and unusual punishment claim against Autumn Danielle Sutton for sexually assaulting Plaintiff on numerous occasions.

**Count 2:** Eighth Amendment claim against Stout Moore, Lawless, Meier, Belts, Tyler Moore, Fischer, Nanny, Owens, Merriman, and Walker for failing to intervene and protect Plaintiff from sexual assault by Sutton.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the Twombly pleading standard**.[2]

Plaintiff has stated a colorable claim against Sutton for violating his Eighth Amendment rights. *See, e.g.*, *J.K.J. v. Polk County*, 960 F.3d 367, 376 (7th Cir. 2020) (sexual assaults that correctional officer committed against incarcerated individuals imposed serious risk to their safety, and officer knew of the danger). Count 1 will proceed against Sutton.

As to Defendants Lawless, Meier, Owens, Nanny, Stout Moore, and Belts, not only does Plaintiff claim that they knew that Sutton was sexually abusing him and they failed to take appropriate action, but he also asserts that they assisted in facilitating or covering

---

2 *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

up the abuse. These facts, as pled, sufficiently state an Eighth Amendment claim, and Count 2 will proceed against Lawless, Meier, Owens, Nanny, Stout Moore, and Belts.

Plaintiff's allegations against Tyler Moore, Brock Fischer, and Sergeant Merriman also establish an Eighth Amendment violation. Plaintiff asserts that although Moore attempted to prevent Sutton from visiting him during work, Moore, Fischer, and Merriman failed to intervene to actually stop the ongoing abuse and report it to the proper authorities. (Doc. 1, p. 12-13). Rather, they simply discussed the abuse in a social media messaging forum. *Id.* Giving Plaintiff the benefit of the inference to which he is entitled at this stage, the Court finds that Plaintiff has stated sufficient facts to support the plausible inference that Moore, Fischer, and Merriman knew about and ignored the risk of harm to Plaintiff and then failed to take reasonable "measures to abate it." *See Nielsen v. Sexton,* 168 F.4th 968, 986 (7th Cir. 2026); *Borello v. Allison,* 446 F.3d 742, 747 (7th Cir. 2006). Count 2 will proceed against Moore, Fischer, and Merriman.

The Court will also allow Count 2 to proceed against Assistant Warden Walker. A claim against a supervisor "must plausibly allege that the supervisor played some role in the conduct through facilitation, approval, or turning 'a blind eye for fear of what they might see.'" *Hess v. Garcia*, 72 F.4th 753, 768 (7th Cir. 2023) (quoting *Kemp v. Fulton County,* 27 F.4th 491, 498 (7th Cir. 2022)). At this point, it is not exactly clear what Walker knew and when, but Plaintiff asserts that Walker encouraged him "to initiate a transfer so the investigation would drop once [he] left and the situation would be covered up." (Doc. 1, p. 13). Thus, Plaintiff has sufficiently established personal involvement by Walker. *See, e.g., Russell v. Bogle,* Case No. 23 C 3682, 2024 WL 2722626, at *7 (N.D. Ill. May 28, 2024)

(finding that at the pleading stage allegations that defendants falsified records were sufficient to infer that they knew or suspected sexual misconduct by another staff member).

## DISPOSITION

**IT IS HEREBY ORDERED** that the Complaint survives preliminary review pursuant to Section 1915A. **COUNT 1** will proceed against Sutton. **COUNT 2** will proceed against Stout Moore, Lawless, Meier, Belts, Tyler Moore, Fischer, Nanny, Owens, Merriman, and Walker. All claims are dismissed against the John Does, tactical team members, and the Clerk of Court **SHALL** terminate the John Does as defendants.

**IT IS FURTHER ORDERED** that the Clerk of Court shall prepare for **Sutton, Stout Moore, Lawless, Meier, Belts, Tyler Moore, Fischer, Nanny, Owens, Merriman,** and **Walker** the following: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to Defendants' place of employment as identified by Plaintiff. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, his last known address. This information shall be used only for sending the forms

as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to file an appropriate responsive pleading to the Complaint in a timely manner and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Local Rule 8.2, Defendants only need to respond to the issues stated in this Merit Review Order.**

Plaintiff is **ADVISED** that at the time application was made under 28 U.S.C. § 1915 for leave to commence this civil action without being required to prepay fees and costs or give security for the same, the applicant and (if applicable) his or her attorney were deemed to have entered into a stipulation that any unpaid costs taxed against the applicant shall be paid from any recovery secured in the action.

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. PROC. 41(b).

**IT IS SO ORDERED.**

**DATED: August 18, 2026.**

Gilbert C. Sison

Digitally signed by Judge Sison
Date: 2026.08.18 12:25:23 -05'00'

**GILBER C. SISON**
**United States Magistrate Judge**

## NOTICE TO PLAINTIFF

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take **90 days or more**. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions and to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at this time, unless otherwise directed by the Court.